**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1030**

In Re:  JEMSEK CLINIC, P.A.; JOSEPH JEMSEK,

                    Debtors.

------------------------------------

BLUE CROSS BLUE SHIELD OF NORTH CAROLINA,

                    Plaintiff - Appellant,

          v.

JEMSEK CLINIC, P.A.; JOSEPH G. JEMSEK, M.D., an individual,

                    Defendants - Appellees.


Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Robert J. Conrad, Jr., District Judge; J. Craig Whitley, Chief Bankruptcy Judge.  (3:14-cv-00417-RJC; 07-03006)


Argued:  December 7, 2016                    Decided:  March 3, 2017


Before WILKINSON, MOTZ, and FLOYD, Circuit Judges.


Vacated and remanded by published opinion.  Judge Motz wrote the opinion, in which Judge Wilkinson and Judge Floyd joined.

**ARGUED:** Christopher Grafflin Browning, Jr., TROUTMAN SANDERS LLP, Raleigh, North Carolina, for Appellant.  William D. Blakely, POLSINELLI PC, Washington, D.C., for Appellees.  **ON BRIEF:** J. Nick Phillips, TROUTMAN SANDERS LLP, Atlanta, Georgia, for Appellant.  Lauren P. Desantis-Then, Washington, D.C., Mit S. Winter, POLSINELLI PC, Kansas City, Missouri, for Appellees.

———————————

DIANA GRIBBON MOTZ, Circuit Judge:

In this case, the bankruptcy court imposed staggering sanctions on a creditor. It dismissed with prejudice claims that the creditor valued at over $10 million, and it ordered the creditor to pay the debtor $1.29 million in attorneys' fees and costs. Although the bankruptcy court did not clearly err in finding that the creditor acted in bad faith, these sanctions were excessive. We therefore vacate the judgment of the district court adopting the bankruptcy court's sanctions order and remand for further proceedings consistent with this opinion.

I.

In May 2003, a group of doctors filed a nationwide class action against the Blue Cross and Blue Shield Association and its member entities, including Blue Cross Blue Shield of North Carolina ("Blue Cross NC"). The doctors brought the case — styled *Love v. Blue Cross and Blue Shield Ass'n*, No. 03-21296-CIV (S.D. Fla. filed May 22, 2003) — in the Southern District of Florida.

In their complaint, the doctors alleged that the Blue Cross companies used several underhanded business practices to deny, delay, and reduce payments for medical treatments based solely on considerations of cost. The doctors alleged that, as part of the scheme, the Blue Cross companies refused to pay for covered and medically necessary treatments, misrepresented the criteria used to determine payments, and unlawfully terminated provider agreements.

3

In September 2006, three years after the initiation of the *Love* case in Florida, Blue Cross NC sued Dr. Joseph Jemsek and the Jemsek Clinic in North Carolina state court. In its complaint, Blue Cross NC asserted several state-law claims, including breach of contract and fraud. At the time, Jemsek ran a clinic in Huntersville, North Carolina that specialized in the treatment of Lyme disease. According to Blue Cross NC, Jemsek improperly billed it for hundreds of Lyme disease treatments that were medically unnecessary or not covered by the parties' provider agreement. Blue Cross NC also alleged that Jemsek fraudulently "upcoded" many of his treatments, assigning them a billing code corresponding to treatments that were more expensive than those he actually provided. Blue Cross NC estimates that from 2000 to 2005, Jemsek received more than $10 million in improper payments.

Jemsek responded by filing for Chapter 11 bankruptcy for himself and on behalf of his clinic. He then removed Blue Cross NC's suit to the bankruptcy court, where it continued as an adversary proceeding. On January 24, 2007, Jemsek filed his answer, affirmative defenses, and nine counterclaims.

Seven of Jemsek's counterclaims alleged essentially the same underhanded practices at issue in *Love*. Jemsek claimed that Blue Cross NC denied claims for reimbursement; terminated the parties' provider agreement "not based upon medical evidence, but upon a desire to limit its costs"; and misrepresented whether Jemsek's treatments were covered or medically necessary. The remaining two counterclaims, asserting defamation and tortious interference with a business relationship, related to

4

statements Blue Cross NC allegedly made about Jemsek's practice to the North Carolina Medical Board and the Centers for Disease Control and Prevention. In total, Jemsek claimed he suffered at least $20 million in damages.

On April 27, 2007, a few days before discovery began in the North Carolina bankruptcy proceedings, the *Love* parties reached a tentative settlement in Florida. Under the terms of the settlement agreement, the Blue Cross companies agreed to pay $130 million and change their business practices. In exchange, the *Love* plaintiffs released their claims against the Blue Cross companies.

On May 31, 2007, the *Love* court preliminarily approved the settlement and enjoined the plaintiffs from litigating any released claims pending final approval. Specifically, the *Love* court enjoined plaintiffs from pursuing "any aspect of any fee for service claim" that

> are, were or could have been asserted . . . by reason of, arising out of, or in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, business practices, representations, omissions, circumstances or other matters referenced in the [a]ction . . . .

It is now undisputed that Jemsek was a putative member of the *Love* class and that this injunction applied to his first seven counterclaims.

In July 2007, the *Love* court mailed a notice of the class settlement to putative class members and published the notice in several major news and trade publications. The notice informed putative class members of their right to opt out of the *Love* settlement. The deadline to opt out was September 14, 2007. Although Jemsek received

the notice, he apparently did not understand its significance and never told his counsel about it. As a result, Jemsek never opted out of the *Love* settlement.

In the meantime, the bankruptcy court in North Carolina continued to referee the parties' "extensive and rancorous discovery efforts." By the bankruptcy court's reckoning, this involved "multiple sets of discovery, motions to compel, several hearings and a lengthy in camera document review" by the court.

On March 31, 2008 — ten months after the *Love* court had issued its May 31 injunction — Blue Cross NC informed the bankruptcy court about the *Love* injunction. At that point, the bankruptcy court had stayed discovery pending the district court's resolution of yet another discovery dispute. After receiving an adverse ruling, Blue Cross NC moved to amend that stay order. In its motion, Blue Cross NC's local counsel reported that it had just learned that Jemsek's counterclaims had been enjoined by the *Love* court.

The bankruptcy court granted Blue Cross NC's motion to amend the stay order, and the parties repaired to the Southern District of Florida. Blue Cross NC moved the *Love* court to enforce its injunction against Jemsek and order Jemsek to withdraw his counterclaims. The *Love* court agreed that its injunction applied to Jemsek's first seven counterclaims and granted the motion. *Love v. Blue Cross & Blue Shield Ass'n*, No. 03-21296-CIV, 2008 WL 4097607, at \*1 (S.D. Fla. Sept. 4, 2008). Jemsek appealed to the Eleventh Circuit, which affirmed. *Thomas v. Blue Cross & Blue Shield Ass'n*, 333 F.

6

App'x 414, 415 (11th Cir. 2009) (per curiam). He then withdrew the seven enjoined counterclaims.

In November 2009, after a nearly two-year hiatus in the North Carolina bankruptcy proceedings, Jemsek filed a motion for sanctions against Blue Cross NC. The bankruptcy court granted the motion. In a lengthy and strongly worded opinion, it found that Blue Cross NC purposefully avoided informing the court and Jemsek about the *Love* settlement and the May 31 injunction. "As a result," the bankruptcy court concluded, "counterclaims worth potentially millions of dollars were lost, this litigation was delayed for more than two years, sizeable attorneys fees and costs were necessitated for [Blue Cross NC's] opponents and an inordinate amount of court time was needlessly consumed."

The bankruptcy court dismissed Blue Cross NC's claims with prejudice and ordered it to pay Jemsek a total of $1.29 million in attorneys' fees and costs. This included nearly all of the attorneys' fees and costs Jemsek incurred in the bankruptcy proceedings and while defending against Blue Cross NC in Florida, including the appellate litigation.

Blue Cross NC sought interlocutory review of the sanctions order, but the district court denied the request. In January 2014, Jemsek amended his remaining counterclaims for defamation and tortious interference. Blue Cross NC filed a motion with the *Love* court to enjoin these amended counterclaims. The *Love* court granted the motion and ordered Jemsek to withdraw those remaining counterclaims, which he did.

The bankruptcy court then issued its proposed findings of fact and conclusions of law and recommended entry of final judgment. Blue Cross NC filed a motion with the district court to vacate the bankruptcy court's sanctions order. The district court denied Blue Cross NC's motion and entered final judgment, adopting the bankruptcy court's proposed findings of fact and conclusions of law. Blue Cross NC timely noted this appeal.

## II.

We first consider whether the bankruptcy court erred when it decided to sanction Blue Cross NC. We review the bankruptcy court's sanctions order for abuse of discretion. *McGahren v. First Citizens Banks & Tr. Co. (In re Weiss)*, 111 F.3d 1159, 1169 (4th Cir. 1997). A court abuses its discretion when its conclusion is "guided by erroneous legal principles" or "rests upon a clearly erroneous factual finding." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).

The bankruptcy court gave several reasons for imposing sanctions. It explained that, in its view, Blue Cross NC violated discovery rules by failing to mention the *Love* case as part of its initial disclosures, failing to amend its initial disclosures after the *Love* court issued its May 31 injunction, and failing to disclose the *Love* case in response to an interrogatory. The court also concluded that Blue Cross NC violated the *Love* court's preliminary injunction, its local rules, and the disclosure rules of the Judicial Panel on

8

Multidistrict Litigation. Finally, the bankruptcy court found that Blue Cross NC acted in bad faith by intentionally withholding information about the *Love* case.

On appeal, Blue Cross NC contends that it had no duty under the rules of discovery to disclose the *Love* settlement or preliminary injunction. It also contends that the *Love* court's injunction did not apply to its claims and that the bankruptcy court lacked the power to sanction it for violating the rules and orders of courts in other jurisdictions.

We agree that Blue Cross NC did not violate the *Love* court's injunction. The *Love* court enjoined only the "Releasing Parties" from litigating any of their released claims against the defendant "Blue Parties." The settlement agreement defines "Releasing Parties" as the class member doctors and certain "Signatory Medical Societies," who all agreed to release their claims *against* the Blue Parties, including Blue Cross NC. The bankruptcy court erred in finding that Blue Cross NC was one of these Signatory Medical Societies. As Jemsek conceded in the bankruptcy court, Blue Cross NC was not a Signatory Medical Society and thus was not one of the releasing parties covered by the injunction. Accordingly, Blue Cross NC did not violate the *Love* court's May 31 injunction by pursuing its claims against Jemsek after that date.

We need not consider most of Blue Cross NC's other contentions because bankruptcy courts have the inherent power to sanction parties who abuse the litigation process in bad faith. *In re Weiss*, 111 F.3d at 1171; *see Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014); *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 375–76 (2007). Here,

9

the bankruptcy court found that Blue Cross NC kept mum about the *Love* court's injunction and thus allowed the bankruptcy court to continue adjudicating counterclaims that had already been enjoined. The court found that by litigating various discovery disputes as though the *Love* court's injunction did not exist, Blue Cross NC, among other things, prolonged the proceedings in the bankruptcy court and thereby wasted "an inordinate amount of court time."

Federal courts have the inherent power to sanction this type of conduct. The courts' inherent powers exist to preserve the integrity of the judicial process and the resources needed to resolve disputes in an orderly and expeditious manner — two indispensable assets in any nation dedicated to the rule of law. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991); *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457–59 (4th Cir. 1993). And it is well established that a federal court may wield its inherent sanctioning powers "when a party 'shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.'" *Chambers*, 501 U.S. at 46 (quoting *Hutto v. Finney*, 437 U.S. 678, 689 n.14 (1978)).

A party undermines the integrity of the judicial process by using a court's resources to litigate claims that it knows or suspects another court has already resolved or enjoined, and it quite obviously wastes scarce judicial resources. Accordingly, it is an abuse of the litigation process for a client to conceal from the court the fact that its opponents' claims have been enjoined. Blue Cross NC had no duty to remind Jemsek about the *Love* court's injunction or the opt-out deadline. But it did have a duty not to

10

waste the bankruptcy court's time and resources by litigating against counterclaims it knew or suspected had been enjoined in light of the pending *Love* settlement agreement. *Cf. In re Cellular 101, Inc.*, 539 F.3d 1150, 1154 (9th Cir. 2008) ("The obligation to inform the court of a potential settlement is of such critical importance to the maintenance of orderly proceedings and to the prevention of needless delay that a lawyer who fails to fulfill that obligation may be personally subject to sanctions."); *Gould v. Bowyer*, 11 F.3d 82, 84 (7th Cir. 1993) ("[I]n order to spare busy courts unnecessary work, parties must advise a court when settlement is imminent.").

The bankruptcy court found that Blue Cross NC did just this, and its finding was not clearly erroneous. First, notwithstanding its lawyers' lack of knowledge, it seems highly likely that Blue Cross NC knew about the *Love* court's injunction well before its lawyers informed the bankruptcy court about it on March 31, 2008. Second, although Blue Cross NC might not have known exactly which counterclaims the *Love* court's injunction covered, it seems likely that Blue Cross NC knew or suspected that several of Jemsek's counterclaims shared a common nucleus of operative fact and asserted many of the same legal theories as the *Love* complaint. Finally, Blue Cross NC offered no credible, good-faith explanation for why it kept silent until Jemsek's deadline to opt out of the *Love* settlement had long passed. It contends only that it could not reasonably have known that Jemsek's counterclaims had been enjoined. But for the reasons already discussed, that appears not to be so. Insofar as there was some doubt about the scope of

11

the *Love* court's injunction, Blue Cross NC never explains why it waited so long to inform the bankruptcy court about this potential development.

On this evidence, the bankruptcy court could reasonably infer that Blue Cross NC acted in bad faith in failing to inform the court of the *Love* court's injunction earlier.[*] Under our deferential standard of review, we have no basis to conclude that this finding constituted error. *See Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (explaining that a court reviewing for clear error will not reverse simply because the reviewing court "would have decided the case differently").

## III.

Although the bankruptcy court did not clearly err in invoking its inherent powers, our review is not yet complete. Even when a court properly concludes that sanctions are warranted, it abuses its discretion when it imposes sanctions disproportionate to the severity of a party's misconduct. *United States v. Rhynes*, 218 F.3d 310, 321–22 (4th Cir.

---

[*] Jemsek suggests that Blue Cross NC delayed revealing the *Love* injunction because it wanted to avoid reminding Jemsek about the opt-out deadline. Jemsek's failure to opt out apparently limited his recovery to an amount less than what he sought as damages in the bankruptcy proceedings. Blue Cross NC contends that its North Carolina lawyers did not know about the *Love* injunction until March 2008 and that Blue Cross NC could not reasonably have known that the *Love* injunction applied to Jemsek's counterclaims. The district court appears to have agreed with Jemsek's view. The record itself yields no definitive answer as to the reason for the delay — it may have been a litigation strategy, or it may have been negligence. Under our deferential standard of review, however, we cannot say the bankruptcy court erred in finding that Blue Cross NC lacked a good-faith reason for failing to inform the court about the *Love* injunction for ten months.

2000) (en banc); *see Chambers*, 501 U.S. at 44–45.  We consider in turn whether dismissal with prejudice or an award of $1.29 million in attorneys' fees and costs were excessive under the circumstances.

A.

Federal courts have the inherent power to dismiss an action with prejudice as a sanction.  *Shaffer*, 11 F.3d at 462.  But because it is "the most extreme sanction," dismissal with prejudice is appropriate only in the most egregious cases.  *See id.*  Even then, a court must first weigh several factors:

> (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.

*Id.* at 462–63.

We do not think Blue Cross NC's conduct called for the most extreme sanction available.  The bankruptcy court's conclusion to the contrary rests primarily on its belief that Blue Cross NC bears responsibility for Jemsek's failure to opt out of the *Love* settlement.

Blue Cross NC certainly wasted the time and resources of Jemsek and, most importantly, the bankruptcy court.  But the only party responsible for the loss of Jemsek's counterclaims is Jemsek himself.  It is undisputed that Jemsek received adequate notice of the *Love* settlement in July 2007 and that he had the benefit of counsel at the time.  As

13

the Eleventh Circuit noted when it considered the issue, "[i]f Jemsek wished to preserve his counterclaims, he could have done so quite easily by opting out of the *Love* action." *Thomas*, 333 F. App'x at 422. Jemsek simply did not appreciate the significance of the notice and so never told his lawyers about it.

This decision was unwise, of course, and it led Jemsek to commit a critical error in this litigation. But the error is Jemsek's, and Blue Cross NC had no duty to correct it. Under our adversarial system, litigants are not their opponents' keepers. They have no duty to help their opponents maximize their recovery or prevent them from losing their claims. Therefore, the bankruptcy court erred when it determined that it could sanction Blue Cross NC for Jemsek's loss of his counterclaims.

Once we remove this error, it becomes apparent that the *Shaffer* factors do not favor dismissal with prejudice. Aside from the second factor — culpability of the client — none of the six *Shaffer* factors favor the bankruptcy court's decision to impose the most extreme sanction available.

The first and third factors — the degree of Blue Cross NC's culpability and the prejudice to the judicial process arising from its delay — weigh against dismissal with prejudice. Although the bankruptcy court wasted some of its resources dealing with Jemsek's enjoined counterclaims, Blue Cross NC's claims were still properly before the bankruptcy court. Blue Cross NC's did not impair the court's ability to adjudicate those claims.

14

The fourth factor — prejudice to the victim — similarly disfavors dismissal with prejudice. As discussed above, and contrary to the bankruptcy court's conclusion, Blue Cross NC did not cause Jemsek to lose his counterclaims. And Blue Cross NC's reticence did not affect Jemsek's ability to defend against Blue Cross NC's claims against him. Accordingly, we fail to see how Blue Cross NC prejudiced Jemsek in this case.

As for the fifth factor — the availability of less severe sanctions — the bankruptcy court concluded that no lesser sanction would suffice because Blue Cross NC caused "extreme prejudice" to Jemsek by "manag[ing] to bar [Jemsek's] compulsory counterclaims even as it seeks recovery on its own claims." This conclusion is mistaken, and once corrected, we see no reason why a lesser sanction could not adequately compensate for any actual harm Blue Cross NC caused and deter similar misconduct in the future.

Finally, regarding the sixth factor, public policy strongly favors deciding cases on the merits. *Shaffer*, 11 F.3d at 462. That preference has not been overcome here, given the absence of prejudice to Jemsek or any connection between Blue Cross NC's misconduct and its claims against Jemsek.

Under these circumstances, dismissal with prejudice was unduly severe.

B.

Of course, a federal court may also order a party to pay an opponent's attorneys' fees as a sanction for bad-faith conduct. *See Chambers*, 501 U.S. at 45–46. Here, the bankruptcy court's award included the expenses Jemsek incurred: "1) in connection with

15

this Adversary Proceeding from May 31, 2007 forward, 2) pursuing discovery responses prior to May 31, 2007, and 3) defending against [Blue Cross NC] after March 31, 2008 in the Florida Court and on appeal during the *Love* injunction proceedings."

We take no issue with the first component of this award. Blue Cross NC should have informed the bankruptcy court about the *Love* court's injunction on May 31, 2007 or shortly thereafter. However, for the reasons already discussed, the bankruptcy court abused its discretion when it awarded the second and third components, which represent a sizable portion of the total award. The court abused its discretion by awarding fees related to discovery before May 31, 2007 because Jemsek incurred these expenses before the *Love* court preliminarily approved the settlement and enjoined litigation of the released claims. Until then, Blue Cross NC had every right to defend against Jemsek's counterclaims.

With respect to the expenses related to the Florida and Eleventh Circuit litigation, Jemsek incurred these expenses because he failed to opt out of the *Love* settlement. He could have easily avoided this error by telling his lawyers about the notice he received. Because Jemsek's expenses are not fairly attributable to Blue Cross NC's misconduct, the bankruptcy court exceeded its sanctioning powers by taxing Blue Cross NC with them.

We recognize that a bankruptcy court has considerable leeway to fashion an appropriate sanction. But in this case, those sanctions were excessive and based on a faulty premise: that Blue Cross NC bore the responsibility for Jemsek's lack of diligence.

16

IV.

For the foregoing reasons, we vacate the judgment of the district court and remand the case for further proceedings consistent with this opinion.

*VACATED AND REMANDED*